**UNITED STATES of America**

v.

**James GUARINO.**

**Crim. No. N–85–56 (TFGD).**

United States District Court, D. Connecticut.

Feb. 12, 1986.

charging defendant James Guarino with unlawful distribution of cocaine on or about August 22, 1985 and possession with intent to distribute cocaine on or about October 9, 1985 in violation of 21 U.S.C. § 841(a)(1). Defendant thereafter moved to suppress evidence pertaining to the October 9, 1985 events and allegedly seized in violation of his Fourth and Fourteenth Amendment rights and statements, admissions, and confessions allegedly obtained in violation of his Fifth, Sixth, and Fourteenth Amendment rights.[1] An evidentiary hearing was held on January 7, 1986 and January 10, 1986, where the Court heard the testimony of Federal Bureau of Investigation (F.B.I.) special agents William P. Dion and Lionel S. Baren, and of defendant, defendant's mother Mrs. Adeline Guarino, and brother Philip Guarino. At the close of the evidence, the Court asked the parties to submit proposed findings of fact and conclusions of law. Having reviewed these submissions and the evidence presented at the hearing, the Court holds that defendant's constitutional rights were violated and accordingly suppresses the evidence, statements, admissions and/or confessions at issue. In support of its decision, the Court enters the following findings of fact and conclusions of law.

Peter A. Clark, Asst. U.S. Atty., New Haven, Conn., for the Government.

Hugh F. Keefe, Lynch, Traub, Keefe & Snow, New Haven, Conn., for defendant.

## RULING ON DEFENDANT JAMES GUARINO'S MOTION TO SUPPRESS EVIDENCE AND MOTION TO SUPPRESS STATEMENTS, ADMISSIONS, AND/OR CONFESSIONS

DALY, Chief Judge.

On November 7, 1985, a federal Grand Jury returned a two count indictment

### FINDINGS OF FACT

During the summer months of 1985, a special agent for the F.B.I., Lionel Baren, and a confidential source, Dominic Ferraro, investigated several drug offenses including those allegedly involving the defendant James Guarino. Ferraro, for example, allegedly purchased cocaine from the defendant on August 22, 1985. Thereafter, the defendant and Ferraro conversed on several occasions and eventually arranged an October 9, 1985 drug transaction in which defendant would deliver to Ferraro a kilo of cocaine in exchange for $47,000. The transaction was to take place at a two-fami-

---

1. The defendant's motion addresses only the events of October 9, 1985 which form the basis of the second count of the indictment.

ly house located at 68 Barclay Street, New Haven, Connecticut, defendant's residence and also the home of defendant's mother and brother. While agents for the F.B.I. and Ferraro contemplated that the sale would take place outside of the home, Ferraro first was to enter the Guarino residence wearing a visor-type hat and then, as he left to purportedly get and bring to defendant the $47,000, was to remove the hat if he had in fact seen a kilo of cocaine inside defendant's home.

On October 9, 1985, at approximately 6:00 P.M., Ferraro, wearing a body recorder, transmitter, and visor-type hat entered defendant's home after approximately four to six armed F.B.I. agents in four to six vehicles had stationed themselves in the neighborhood. At approximately 6:15 P.M., defendant came out onto the front porch of his home and began descending the stairs as Ferraro exited the house to obtain the $47,000 he had indicated to the defendant was in the trunk of his car. While walking toward his car Ferraro signalled with his visor. At least four or five FBI agents converged in front of the Guarino residence with guns drawn. Defendant testified that one agent with a shotgun aimed directly at him told him not to move or he would "blow his head away". At this time, Philip Guarino was observed standing in the front door and was ordered out of the house. Special Agent Stubing handcuffed the defendant while Special Agent Baren handcuffed Philip Guarino, after having forced him to the ground. Philip Guarino, according to Agent Baren's testimony, appeared "very frightened, very anxious, very nervous".

Another F.B.I. agent had now pulled up in front of the Guarino home for the purpose of taking the informant Ferraro away. Moments later, after the defendant and his brother had been placed in custody, Baren stepped over to a now hand-cuffed Ferraro who advised Baren that what he was looking for was "just inside the door to your left before you enter the apartment". Neither an arrest warrant nor a search warrant had been applied for at this point, but the Guarino brothers had been placed in what Agent Baren termed "investigative detention." No *Miranda* warnings were given, and Special Agent Dion was dispatched to conduct a "protective sweep" of the house. Eventually nine agents arrived at the scene and all nine agents entered the house throughout the evening that was to follow.

During Special Agent Dion's initial protective sweep of the Guarino residence, he encountered with his gun drawn an elderly woman, the defendant's mother who owned the two-family house and who had been resting in the bedroom. Mrs. Guarino testified that she was scared and at some point was asked if she was on dope. She replied that she does not take dope, nor did she smoke or drink. Having made sure the defendant and his brother were securely in custody, Special Agent Baren joined Special Agent Dion in conducting the protective sweep. They looked into every room and also under the beds. Special Agent Baren testified that he identified himself to Mrs. Guarino and told her the agents were there because they suspected contraband was in the residence. No one other than Mrs. Guarino was found in the home and the protective sweep, necessary perhaps to secure the home, failed to produce any cocaine. Special Agent Baren testified that they were in fact concerned about the cocaine during the protective sweep, specifically that no one was "standing over a toilet dumping two pounds plus of white powder and flushing the toilet".

The sweep concluded and Special Agent Baren, no longer concerned that there was any threat, went outside and joined Special Agent Stubing in escorting James and Philip Guarino into their home. Philip Guarino, still handcuffed with his hands behind him, was brought into the kitchen where his mother eventually joined him and a special agent who remained with them throughout much of the evening. The defendant, also still similarly handcuffed, was brought into the living room from where he could see his mother visibly shaken and often crying. Shortly after being brought into the house, Philip's handcuffs were removed. Accord-

ing to Agent Baren's log, compiled a day later and without notes, the defendant's handcuffs were removed at 6:27 P.M. Baren's log contained various times, some of which Baren testified he remembered from having glanced at his watch and others of which he reconstructed based on approximate time lapses after he had glanced at his watch. Although the time noted for removal of defendant's handcuffs was such a reconstruction, it is undisputed that defendant had been handcuffed for approximately twelve minutes.

After defendant's handcuffs were removed, Agent Baren testified that he informed the Guarinos "they were free to move about the apartment or leave as long as they did not interfere with any search which may ensue". At approximately 6:40 P.M. an agent told the defendant that a search warrant had been applied for, despite the fact that no application for a warrant had yet been made. During this early part of the evening there were five or six agents at any one time in the house. Agent Baren did not give the Guarinos a time as to how long the agents would remain in the home, but the defendant testified that the agents said they would stay all evening, if necessary, until a search warrant had been obtained and that, until that time, no one would be going anywhere. Defendant further testified that no one advised him he was free to leave. Philip Guarino likewise testified that he never felt free to leave and both he and the defendant testified that when the phone rang an agent would answer it. Later in the evening, when the lights went out apparently due to a power failure, Philip Guarino felt it necessary to ask permission of the agent sitting with him in the kitchen to wind and set an alarm clock in his bedroom. The agent said yes, but called to another agent to inform him that Philip was going into the bedroom. Throughout the early part of the evening, James Guarino sat on the couch with agents to his left and right, was questioned, and, although the agents' guns were no longer drawn, never felt as if he "had any freedom".

Despite Ferraro's earlier statement to Agent Baren that what they were looking for was just inside the door to your left before you enter the apartment, Baren never looked there for the cocaine nor did he have any other agent look there for the cocaine. Rather, according to Baren, at approximately 6:48 P.M. while the defendant was seated in the living room with Agent Baren to his right, Special Agent Genova present, and a Drug Enforcement Agency agent and other agents coming in and out of the room, defendant indicated that he knew why they were there. Defendant then walked towards the front door, passed into the hallway, and pointed to a black plastic bag that was sitting atop a chest of drawers. Agent Baren testified that defendant was "asked what the bag contained" to which defendant "explained that it contained cocaine". Absent that explanation, there is no evidence that would indicate that any of the agents knew the cocaine was in a black bag or on top of the dresser. Additionally, there is no evidence that one would know or have probable cause to believe the black bag contained cocaine, absent defendant's purported explanation. The bureau on which the cocaine rested contained personal belongings of the Guarino family and, according to Agent Baren, was located in an area "closest to the Guarino apartment and the people going to and from the upstairs would have no reason to be coming over there unless presumably to knock on the door of the Guarino house".

The agents according to Baren were now aware of a black bag which defendant indicated contained cocaine, but still they did not leave. Rather, they then obtained consents to search from both the defendant and Philip Guarino. As with the protective sweep, the agents' further searches of the premises failed to produce any evidence. While the other agents searched, Agent Baren continued to talk with the defendant and testified that he again told defendant he was not under arrest and was free to leave. Defendant did not leave and the questioning continued. Defendant, for example, was asked where the kilo came from

and, when he answered "from Henry", was asked if he knew who "Henry" was. After approximately forty-five minutes to an hour of questioning in the living room and front porch, the defendant and Special Agents Baren and Genova left the Guarino residence for further questioning over coffee at a Dunkin Donuts.

At Dunkin Donuts, the agents asked defendant again if he could tell them where the cocaine had come from and whether he had driven to New York that night or that day. Agent Baren testified that defendant "advised that he had acquired the cocaine from Henry the same day in town". Defendant and the agents then returned to the Guarino residence, where a number of agents were still present finishing the search of the residence. The power had since failed, and the defendant again left with the special agents to travel to the F.B.I. office where there were lights and coffee. Questioning continued until approximately midnight when defendant left the F.B.I. headquarters. It is noteworthy that at 11:07 P.M. the defendant for the first time received his *Miranda* rights. At no time was an arrest warrant or search warrant obtained.

## CONCLUSIONS OF LAW

■ Throughout the evening of October 9, 1985 until 11:07 P.M. when defendant's *Miranda* warnings were administered, the F.B.I. agents obtained various statements, admissions, and confessions from the defendant, all of which the Court finds were obtained without regard to defendant's Constitutional rights. In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1965), the Supreme Court held that law enforcement officials must take necessary precautions prior to "custodial interrogation" to protect a defendant's Fifth and Fourteenth Amendment privilege against compulsory self-incrimination. Simply, absent "procedural safeguards effective to secure the privilege against self-incrimination ... the prosecution may not use statements whether exculpatory or inculpatory, stemming from custodial interro-

gation of the defendant." *Id.* at 444, 86 S.Ct. at 1612. "The *Miranda* Court ... presumed that interrogation in certain custodial circumstances is inherently coercive and held that statements under those circumstances are inadmissible unless the suspect is specifically informed of his *Miranda* rights and freely decides to forego those rights." *New York v. Quarles*, 467 U.S. 649, 104 S.Ct. 2626, 2631, 81 L.Ed.2d 550 (1984). Prior to 11:07 P.M., the agents failed to inform defendant of his *Miranda* rights and accordingly defendant's statements, admissions, and confessions prior to that time must be suppressed.

In determining whether defendant was in custody for purposes of *Miranda's* "custodial interrogation" requirement, "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 3152, 82 L.Ed.2d 317 (1984). A defendant's *Miranda* rights also attach when a person has been "otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612. A " 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest" requires compliance with *Miranda*. *Quarles*, 104 S.Ct. at 2631 (citations omitted).

Clearly, a reasonable person in defendant's situation, handcuffed with his hands behind his back and surrounded by armed agents, would have understood he was "in custody". The restraint on defendant's freedom of movement or his otherwise custodial situation, however, did not end when his handcuffs were later removed. Although Agent Baren contends he told the Guarinos they were free to leave, the Court finds that no reasonable person would have felt free to leave in the circumstances which ensued following defendant's initial handcuffing. In *United States v. Lee*, 699 F.2d 466 (9th Cir.1982), for example, agents investigating the murder of defendant's wife asked defendant if he would "agree to be interviewed in the FBI car which was parked in front of the house. When he

entered the vehicle with the two agents he was told he was free to leave or terminate the interview at any time, but at no time was he advised of his *Miranda* rights". *Id.* at 467. The Ninth Circuit upheld the District Court's finding that the defendant was in custody and was unlawfully interrogated, despite the fact that the defendant had not been forced into the car. *Id.* at 468. As in *Lee*, this Court finds that no reasonable person could conclude he was free to leave under the circumstances confronting James Guarino. Defendant was not voluntarily brought into his home, but was escorted in handcuffs. His brother, also handcuffed, was segregated from the defendant and felt it necessary to ask permission of an agent to leave the kitchen and wind an alarm clock. Various F.B.I. agents and a Drug Enforcement Agency agent constantly wandered in and around the Guarino premises and when the phone rang, the Guarinos did not feel they were free to answer it.

Additionally, the defendant denies he was ever told he was free to leave. Rather, he never felt as if he had any freedom and further testified that the agents said they would stay all evening until a search warrant had been obtained and that, until that time, no one would be going anywhere. Agent Baren himself admitted that the Guarinos were told a search warrant had been applied for when no application had yet been made. The fact that defendant's elderly mother was visibly shaken and often crying buttresses defendant's testimony that he never felt free to leave. Indeed, it appeared the F.B.I. agents were staying in Mrs. Guarino's home and the defendant's residence without a search warrant, even after the protective sweep secured the area and produced no evidence. The defendant was questioned throughout the evening and at no point was he unaccompanied by agents. In light of the foregoing, the Court cannot conclude that any reasonable person would have felt free to leave. *Berkemer*, 104 S.Ct. at 3152. Defendant was significantly deprived of his freedom of action and clearly was restrained in his freedom of movement of the degree associated with a formal arrest. *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612, *Quarles*, 104 S.Ct. at 2631, *Lee*, 699 F.2d at 468.

The Court also finds a logical nexus between the defendant's statements, admissions, and confessions obtained prior to 11:07 P.M. and the custodial interrogation which took place. Custodial interrogation, for *Miranda* purposes, involves "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way". *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612. The F.B.I. agents handcuffed the defendant who was surrounded by armed agents, brought him inside, removed his handcuffs, and initiated their questioning. The defendant was seated on the living room couch between two agents, while his brother and mother were seated in another room. Defendant could see his mother crying. Although the agents had no search warrant and arguably no right to stay in the house once the protective sweep had secured the area and produced no evidence, they remained on the Guarino premises. Following a series of questions, defendant finally walked towards the front door, passed into the hallway, and pointed to a black plastic bag that was sitting atop a chest of drawers. The defendant was asked what the bag contained to which he explained "cocaine". Absent that explanation, there is no evidence that would indicate that the agents knew the cocaine was in a black bag or was located on the dresser. Even if an agent had seen the black bag, there is no evidence that he or she would know the black bag contained cocaine. Accordingly, since custody began the moment defendant was handcuffed and told not to move and custodial interrogation continued until approximately midnight, the Court suppresses defendant's statements, admissions, and confessions made prior to 11:07 P.M. when defendant for the first time received and purportedly waived his *Miranda* rights. The Court specifically includes within the scope of its

suppression ruling defendant's act of pointing to the plastic bag and identifying its contents as cocaine and further notes that the agents' conduct is precisely the type of conduct *Miranda* and the constitutional guarantee against self-incrimination seeks to deter.

 Finally, the Court also suppresses the cocaine seized at the Guarino residence as the fruit of the poisonous tree under the doctrine of *Wong Sun v. United States*, 371 U.S. 471, 485–86, 83 S.Ct. 407, 416, 9 L.Ed.2d 441 (1963). Although *Wong Sun* involved a violation of the Fourth Amendment, the "Court has applied the doctrine where the violations were of the Sixth Amendment ... as well as of the Fifth Amendment". *Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 2508, 81 L.Ed.2d 377 (1984). Since the defendant's act of pointing to the black bag and identifying its contents as cocaine was unlawfully obtained and has therefore been suppressed, the cocaine seized as a direct result of this act must likewise be suppressed. *See, e.g., Lee*, 699 F.2d at 468 (lead pipe suppressed because its seizure was the direct result of an unlawfully obtained confession).

The government argues, however, that the cocaine was in plain view and would have therefore been seized anyway pursuant to the agents' search affected by defendant's and Philip Guarino's consents to search. Apparently, the government seeks to utilize in this context the ultimate or inevitable discovery doctrine expressly approved by the Supreme Court in *Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), as an exception to the exclusionary rule. The prosecution, to avoid suppression, must "establish by a preponderance of the evidence that the [evidence] would ultimately or inevitably have been discovered by lawful means". *Id.* at 2509.

The Court rejects the government's argument on two grounds. First, the evidence was not in plain view. Rather, despite the informant's indication of where the cocaine was located, no one observed the evidence prior to defendant's act of pointing to the black bag. Nor was any evidence heard at the hearing which would indicate the agents had reason to believe the cocaine was in a black bag or the agents would have discovered the cocaine had defendant not led them to it. *Cf. Texas v. Brown*, 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983) (plurality opinion) (trained police officer who had seen further evidence of narcotics and who knew that balloons are frequently used to carry narcotics had probable cause to believe that a balloon in plain view contained contraband). Absent such evidence, the Court cannot find the plain view doctrine applies. Many agents had entered the Guarino home through the front hallway where the plastic bag was located. Agent Baren admitted that he was specifically concerned during his protective sweep that no one was "standing over a toilet dumping two pounds plus of white powder and flushing the toilet". Also, the informant Ferraro told Baren the cocaine was in the hallway. Yet there is no evidence that either the plastic bag was seen or identified as a container for cocaine until defendant's later explanatory actions. The plain view doctrine does not obtain under such circumstances.

The Court further rejects the government's argument that the evidence would have been ultimately seized pursuant to a valid search. Warrantless searches are *per se* unreasonable. *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). The government, however, seeks to bring its agents' actions within the "consent" exception to the Constitutional mandate for a warrant. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Under this exception, the prosecutor must prove by a preponderance of the evidence that the consent was freely and voluntarily given. *Id.* at 222, 93 S.Ct. at 2045. The "fact of custody does not alone preclude the giving of a voluntary consent ... but it should require more careful scrutiny". *United States v. Weiner*, 534 F.2d 15, 17 (2d Cir.1976). In light of the facts of this case, the Court need not belabor the issue.

Defendant's briefs are replete with authority indicating why the consents executed were not voluntarily made and the Court incorporates defendant's argument on this issue by reference herein. *See* Defendant's Memorandum of Law in Support of Motion to Suppress Evidence and Defendant's Post-Hearing Brief in Support of Motions to Suppress Evidence, Statements, Admissions, and Confessions of the Defendant. In further support of defendant's position are the facts that the consents were executed *after* defendant had identified the cocaine, the physical and frail condition of defendant's mother, and an agent's misrepresentation that a warrant had been applied for when no application had been made. Additionally, a protective sweep of the home had already been made and thereafter the Guarinos could see and hear roaming through the residence agents they presumed were already searching. In light of the fact of custody requiring more careful scrutiny on the issue of consent and the authorities cited by defendant in his prehearing and post-hearing memoranda, the Court concludes the government has failed to bear its burden in proving voluntary consent by a preponderance of the evidence.[2] Accordingly, the cocaine seized must be suppressed as the fruit of the poisonous tree.

For the foregoing reasons, defendant's motion to suppress evidence seized prior to 11:07 P.M. on October 9, 1985 and to suppress statements, admissions, and confes-

**2.** The government further argues that because the evidence was seized in a common hallway where defendant allegedly had no legitimate expectation of privacy, there was no search and thus neither a warrant nor consent was required. In support of this argument, the government cites *United States v. Holland,* 755 F.2d 253 (2d Cir.1985), where the Second Circuit endeavored to lay "down a clearly defined boundary line for constitutionally permissible police action," and thus held that "the common halls and lobbies of multi-tenant buildings are not within an individual tenant's zone of privacy even though they are guarded by locked doors". *Id.* at 255–45. In applying its holding, the *Holland* court found that in the common ways of his building the claimant "reasonably might expect to meet the landlord or his agents, the occupants of the first floor apartment, deliverymen, tradesmen, or one or more visitors to the first floor apartment ... He had no right to exclude them from the common hallway, and there is no indication that he ever tried to do so". *Id.*

The Court concludes that the instant case does not fit within the clearly defined boundary line in *Holland,* but rather the defendant had a legitimate expectation of privacy in the area in which the cocaine was located. As in *Holland,* the front door to Mrs. Guarino's house was kept locked, but the front hallway was not a common way where the defendant might reasonably expect to find the assortment of individuals as the claimant in *Holland.* Indeed, unlike the claimant in *Holland,* Mrs. Guarino owned the two-family house. The Court need not address, however, whether the entire front hallway was in defendant's zone of privacy since the cocaine was located on a bureau in an area under the sole control of the Guarino family. Agent Baren himself testified that the bureau was located in an area which was "closest to the Guarino apartment and the people going to and from upstairs would have no reason to be coming over there unless presumably to knock on the door of the Guarino house". Additionally, the bureau contained personal belongings of the Guarino family. The defendant could reasonably expect that the items in and on the bureau would not be disturbed and the Guarinos clearly had the right to exclude others from disturbing such items. The fact that the defendant chose to leave a kilo of cocaine on the bureau, then exit the residence provides further support that he reasonably expected that items left on or in the bureau would not be disturbed. Accordingly, the Court finds defendant had a legitimate expectation of privacy to the items in and on the bureau and thus a search of those items required compliance with the Fourth Amendment. Absent a warrant or a valid consent to search, the Court concludes that the cocaine seized must be suppressed.

The Court further notes that even if defendant did not have a legitimate expectation of privacy to the items in and on the bureau, the government has failed to prove by a preponderance of the evidence that absent defendant's act of pointing to the cocaine, the evidence would have ultimately been discovered. *See Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). Simply, the record is devoid of any evidence indicating the agents had reason to believe the cocaine was in a black bag or the agents would have discovered the cocaine had defendant not led them to it. A plethora of agents had entered the front hallway prior to defendant's actions including Agent Baren who had been told by the informant where the cocaine was located. Agent Baren was specifically concerned about the whereabouts of the cocaine. Yet, it was not until defendant's explanatory act that the cocaine was discovered.

sions[3] obtained prior to 11:07 on October 9, 1985 is hereby GRANTED.

---

3. The government has submitted a post-hearing affidavit of Agent John L. Stubing indicating that as Stubing handcuffed the defendant, after having advised defendant that he was an F.B.I. agent, defendant allegedly stated, "I know why you're here, that's my brother, he's not involved". At best, this information is an afterthought. It was not presented at the hearing where it might have been subject to cross-examination nor is it consistent with the hearing testimony. The Court declines to give any consideration or weight to the affidavit. The government's opportunity to introduce evidence as to why statements made prior to 11:07 P.M. on October 9, 1985 should not be suppressed was at the January 7, 1986 and January 10, 1986 hearing of which there was due notice.