The UNITED STATES of
America, Plaintiff,

v.

Rene CORRAL–CORRAL and Cesar
Garcia, Defendants.

No. CR88–0039J.

United States District Court,
D. Wyoming.

Dec. 21, 1988.

---

Lisa Leschuck, Asst. U.S. Atty., Cheyenne, Wyo., for plaintiff.

Glenn A. Duncan, Laramie, Wyo., for defendants.

ORDER SUPPRESSING EVIDENCE

JOHNSON, District Judge.

## BACKGROUND

On 18 April 1988, at approximately 2:00 p.m., Wyoming highway patrolman Robert Todd Gregory was traveling in the eastbound lane of Interstate 80. At about milepost 297, approximately 13 miles west of Laramie, Wyoming, he observed a dark blue vehicle approaching from the east. Patrolman Gregory claims that his radar indicated this oncoming vehicle was traveling at 70 m.p.h. (R. 61) This vehicle, a 1983 Thunderbird, was driven by defendant Rene Corral–Corral (Corral). Defendant Corral claims that upon seeing the approaching patrol vehicle, he glanced at his speedometer, which read 65 m.p.h. (R. 351–52)

Patrolman Gregory crossed the median and pulled defendant Corral over. As both men stood beside the Corral vehicle, Patrolman Gregory informed Corral that he had been stopped for speeding and requested Corral's driver's license and car registration. (R. 63–64) The registration indicated that the car belonged to Javier Padilla. (R. 382) Corral explained that he had recently bought the car at a $1,000 discount because he was willing to pick it up and that he was heading back to California. (R. 64–66) Corral maintains this information concerning the purchase of the car was obtained as he later stood handcuffed in the barrow ditch. (R. 362) The court believes patrolman Gregory's account. It makes sense that such matters would be discussed immediately after discovery that Corral's name did not appear on the registration. An NCIC check did not reveal any problems. (R. 174–75)

Officer Gregory began writing Corral a warning ticket. While retaining the driver's license and registration, Patrolman Gregory asked Corral if he was carrying any firearms, large sums of money, or drugs. Corral responded that he was not. (R. 68, 353). Patrolman Gregory then asked if he could "look through" Corral's vehicle. Corral responded, "No, go ahead." (R. 353)

After returning to Corral's vehicle, the two men discovered that Corral had locked his keys inside it. With Corral's permission, patrolman Gregory unlocked the door by use of a "slim jim" device. (R. 70, 354) While "looking through" the car, patrolman Gregory found $810 in the left pocket of a trench coat located in the back seat. (R. 71) Corral explained that he was carrying this money in case of car trouble. Patrolman Gregory then asked Corral if he could "look in" the trunk. (R. 71, 358) Corral responded with words to the effect that, "Sure, he could look in my trunk." (R. 358)

After some difficulty with the trunk release button, Corral opened the trunk with the key. (R. 71, 358) Inside the trunk were at least three pieces of luggage. The testimony conflicts as to what occurred when patrolman Gregory grabbed the first piece of luggage, a brown duffel bag. Cor-

ral maintains that he then said, "Wait a minute. I don't want you looking through my personal things," and that patrolman Gregory advised him to "step back from the vehicle." (R. 359) Patrolman Gregory maintains that Corral made no such request. (R. 73) Inside the third piece of luggage opened, patrolman Gregory found a large sum of cash (R. 73) (later determined to be $298,919). At the scene, Corral denied any knowledge of the money. (R. 73, 360).

At approximately 2:30 p.m., Patrolman Gregory handcuffed Corral and placed him in the barrow pit, about 15 feet from the vehicle. (R. 74, 360) At approximately 2:36 p.m., Sgt. Mike Johnson of the highway patrol arrived on the scene. About ten minutes after that, patrolman Lance Novak also arrived. (R. 75–76) Patrolman Novak says that upon arriving at the scene he was informed both by patrolman Gregory and Corral that consent had been given to search the vehicle. (R. 182) Nothing in any police report confirms that account. Corral denies verifying that he gave consent. (R. 368) During the search of the passenger compartment of the vehicle, patrolman Novak found "a small black fanny type of bag" containing various toiletries. A small brown box was located containing some gold colored lapel pins. Although the patrolmen's testimony conflicts on the sequence, two important events then occurred: (1) patrolman Novak discovered in a zippered compartment to the fanny pack a baggie containing a white substance, and (2) patrolman Gregory asked Corral if the lapel pins belonged to him. Patrolman Gregory testified that the question concerning the lapel pins followed the discovery of the white powder. (R. 77) Patrolman Novak testified differently. (R. 183) As patrolman Novak left the vehicle with the bag in his hand, Corral asked, "What's that?" Officer Novak responded, "What, this?" Corral replied, "That wasn't in the bag when I put the other things in there." (R. 184).

Patrolman Novak discovered the white substance at about 2:55 p.m. Patrolman Gregory arrested Corral at about 3:05 p.m. After being advised of his rights, Corral chose to remain silent. He was then transported to the Albany County Jail in Laramie, Wyoming. (R. 78, 118)

Tony Hinton, special agent with the Wyoming Division of Criminal Investigation, proceeded to Laramie from Cheyenne, Wyoming, with Dick McCoy, a drug enforcement administration (DEA) agent, and Al Bennett, an agent in the Wyoming Division of Criminal Investigation. In Laramie, Sgt. Johnson briefed them on the details of the stop and arrest. After inventorying the vehicle, Hinton obtained a statement from Officers Gregory and Novak. (R. 210–14) At about 9:45 p.m., Hinton, Bennett, and Corral drove back to Cheyenne. (R. 216) Certain conversations occurred during that trip.

On the trip to Cheyenne, agent Hinton told Corral to let him know if he got cold so he could turn the heater up. (R. 217) Corral describes Hinton's conduct on the trip as "very polite, very nice." (R. 367) Corral asked what would happen to him. Hinton explained the process in federal court. Hinton mentioned the possibility of Corral's cooperation in an investigation. (R. 217, 367) Corral rejected this idea for fear of being killed and as being against his morals. (R. 218, 387) Corral also expressed the view that he had been played for a fool. (R. 219, 386) Corral stated a hope that Hinton would not call Corral's parents. (R. 219, 393) Hinton also says that Corral asked him if he would look inside a suitcase if handed one. (R. 218) Corral described Hinton's testimony as "pretty accurate," but could not remember saying "they handed it to me and I took it." (R. 368)

While at the Laramie headquarters building, Hinton received a call from Bob Fulkerson of DEA, advising him that contact had been made with Pittsburg, California, detectives. (R. 214) At about 8:30 p.m. (MST), Hinton spoke over the phone with Sgt. Evan Kohler, head of the Pittsburg narcotics office. Hinton advised Kohler of the facts surrounding the arrest. He also advised Kohler of a subsequently learned fact—Corral was traveling from Aurora, Illinois. (R. 215) While waiting for Corral at the Albany County Jail, Hinton again

called Kohler. At about 11:10 (MST), Hinton once more called Kohler (who had seized the premises at 110 Northstar Drive) to inform him that Corral would soon be using the phone. (R. 234) Corral telephoned 110 Northstar Drive several times (R. 389) but the collect charges were refused. (R. 263)

Based on the information before him, Kohler felt justified in seizing the premises at 110 Northstar Drive. At about 5:15 p.m. (PST), Kohler sent a detective there to set up surveillance until he could get enough officers to secure the premises. At 5:45 p.m. (PST), Kohler seized the premises. (R. 259)

At about 8:00 p.m. (PST), while Kohler was still preparing the affidavit for a search warrant, Manual (Cesar) Garcia and Hilario Corral entered the premises. Hilario Corral stated that he was Rene Corral–Corral's cousin and that he had just given Cesar Garcia, who claimed to be a resident of 110 Northstar Drive, a ride from the airport. To convince the officers that he was not involved in illegal activity he invited them to search his residence. After signing a consent form, Hilario Corral led two officers to his residence at 2160 Peach Tree Circle in Pittsburg. Cesar Garcia and his luggage were detained. (R. 261–62) After searching Hilario Corral's residence, the officers returned to 110 Northstar Drive with a red, white, and blue athletic bag allegedly belonging to defendant Corral. (R. 273–74)

At 1:35 a.m. on 19 April 1988, based on information contained in Sgt. Kohler's affidavit, municipal judge Bellici signed a search warrant for 110 Northstar Drive and for the bags of Garcia and Corral. Inside Garcia's suitcase officers found $31,-000. Inside the red, white, and blue athletic bag officers found $77,000 and some scented wax. (R. 273–74) The search of 110 Northstar Drive uncovered a large, plastic-wrapped package of white powder (suspected cocaine), green plant material (suspected marijuana), indicia of occupancy, a Browning B–80 12–gauge shotgun, a Remington 22–caliber bolt action rifle, and a Browning 380–automatic handgun. (Return to Search Warrant pp. 1–2)

## THE INITIAL STOP

■ Patrolman Gregory claims to have stopped the Thunderbird driven by Corral for speeding. The maximum speed allowed on interstate highways in Wyoming is 65 m.p.h. Wyo.Stat. § 31–5–301(b)(iii) (Cum. Supp. June 1988). Upon observing a traffic offense, a patrolman may properly pull the vehicle over. Defendant Corral does not appear to contest these assertions. Instead, he argues that the initial stop was not for speeding, but was a pretext stop based on drug courier profile. Corral offers several arguments in favor of his pretext stop theory.

Upon observing the on-coming Wyoming highway patrol vehicle, Corral claims to have looked at his speedometer and confirmed his speed at 65 m.p.h. Patrolman Gregory first testified that he locked Corral's vehicle on radar at 70 m.p.h. and kept that speed locked until 3:20 or 3:30 p.m. (R. 62) Corral testified that the radar gun was blank until, demonstrating the radar gun to Corral, patrolman Gregory clocked a passing car at 72 m.p.h. (R. 352) On cross-examination, patrolman Gregory was uncertain whether radar was locked in, declaring that "[i]f I remember right I did have that locked in." (R. 155). He could not recall demonstrating the radar gun. (R. 155)

Patrolman Gregory testified that he wrote a warning ticket for Corral. Corral notes that the government has produced no copy of a warning ticket. He further notes that Wyoming law makes no provision for warning tickets. Corral relies on these observations to support his testimony that he was not speeding when stopped.

Patrolman Gregory first observed Corral's vehicle one-half to three-quarters of a mile in front of him. (R. 179). As the vehicles approached each other, nothing obstructed a view of the California license plates. (R. 154) Although he did observe that the approaching car was dark blue, he has testified that he did not observe the California plate. (R. 61, 154) Corral sug-

gests that this testimony is unworthy of belief since patrolman Gregory is admittedly a trained observer. (R. 154) Corral then proceeds to what he states are pretextual reasons for the stop.

The two cars passed by each other near milepost 297, thirteen miles west of Laramie, Wyoming. Patrolman Gregory estimated that at this point the roads are separated by about twenty feet. (R. 104) Corral argues that from this distance patrolman Gregory could and did discern that he was Hispanic. Patrolman Gregory freely admits that when presented with a view of Corral, such as after the stop or in court, he appears of Hispanic origin. (R. 94) He testified that he could not discern that as the vehicles passed each other due to the tint in Corral's windows. (R. 62) This tint, he testified, prevented him from seeing in the vehicle (R. 97) to the extent he could not even see the driver. (R. 117)

Much evidence was received concerning the amount of tint in the Thunderbird's windows. In photographs taken from five to ten feet, while the car was located both in a garage and outside in overcast conditions, the seats and steering wheel are easily seen. Objects on the other side of the car are perceivable through the Thunderbird's windows. Patrolman Gregory testified that 18 April 1988 was a bright, sunshiny, clear day. (R. 116) At 2:00 p.m. the sun was shining into the driver's side window of the Thunderbird. (R. 116) Corral argues that this sunshine into the window would increase patrolman Gregory's visibility into the Thunderbird.

Corral identifies certain "drug courier profile" materials to which patrolman Gregory had been exposed. About seven to ten days before 18 April 1988, he read a 25-page booklet put out by the Utah Highway Patrol entitled, "Criminal Interdiction Through Traffic Enforcement." (R. 59, 80, 92–92) After 18 April 1988 he watched a movie produced by the New Mexico highway patrol called, "Operation Pipeline." (R. 60) He also looked at the pictures in, but did not read, the "New Mexico Interstate Highway Cocaine Courier Profile." (R. 109–11) Patrolman Gregory would not agree that Hispanics are "near the top of the list of people to think about in terms of profile...." (R. 109)

Finally, Corral argues the stop resulted from the state's desire for financial gain made possible by a forfeiture statute contained at Wyo.Stat. § 35–7–1049(j) (June 1988). Under this statute, "[t]he property or proceeds shall be in addition to funds appropriated to the law enforcement agency by the state legislature or any unit of local government." *Id.*

Having heard all this testimony and observed the witnesses, this court concludes that the initial stop was not pretextual but was for speeding. As such the initial stop was legal. The court is not persuaded that patrolman Gregory ascertained Corral's Hispanic origin as the cars passed by each other at a combined speed over 120 m.p.h.

## CONSENT

Whether state police officers have acted reasonably in relation to fourth amendment rights is a question of federal law. *United States v. Lopez,* 777 F.2d 543, 550 (10th Cir.1985) (citing *United States v. Alberty,* 448 F.2d 706, 708–09 (10th Cir.1971)). The technical requirements of the fourth amendment do not apply to searches undertaken pursuant to consent. Such consents are valid if voluntarily given. *United States v. Lopez,* 777 F.2d at 548 (quoting *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973)). In determining whether consent is voluntary, Tenth Circuit case law employs a three-step analysis: (1) "there must be clear and positive testimony that the consent was unequivocal and specific"; (2) "the consent [must be] given without duress or coercion"; and (3) these standards are evaluated "with the traditional indulgence of the courts against a presumption of waiver of constitutional rights." *United States v. Recalde,* 761 F.2d 1448, 1453 (10th Cir.1985) (citing *United States v. Abbott,* 546 F.2d 883, 885 (10th Cir.1977); *Villano v. United States,* 310 F.2d 680, 684 (10th Cir.1962)). "The Government has the burden of proving that consent was given freely and voluntarily." *Recalde,* 761 F.2d

at 1453 (citing *United States v. Mendenhall*, 446 U.S. 544, 557, 100 S.Ct. 1870, 1878, 64 L.Ed.2d 497 (1980); *Schneckloth*, 412 U.S. at 227, 93 S.Ct. at 2047).

In this case, Corral asserts that his consents given to patrolman Gregory to "look through" the car and "look in" the trunk were involuntarily given. To support this view, he points out that the patrolman had retained Corral's driver's license and registration when the requests were made. Under nearly identical circumstances, the Tenth Circuit has rejected this claim. In *Recalde*, 761 F.2d 1448, a vehicle was pulled over for speeding. After securing the driver's license and registration, the patrolman observed that the automobile was registered to one other than the driver. A NCIC check was negative. Consent was obtained to search the vehicle. Although a later search of the vehicle at the police station was held unconstitutional, the court noted that "[t]he record indicates that this [the roadside] search was made only after Recalde freely consented, and nothing in the record casts doubt on the voluntariness of that consent." *Id.* at 1455. This was so despite the ·patrolman's continued possession of the speeding ticket, driver's license, and automobile registration. *Id.* at 1452. In *U.S. v. Guglielmo*, 834 F.2d 866, 869 (10th Cir.1987), the court restated this analysis and conclusion.

Corral next argues that consent to "look through" the vehicle and to "look in" the trunk are not consents to *search.* Again, Tenth Circuit case law belies Corral's contention. In *United States v. Espinosa*, 782 F.2d 888 (10th Cir.1986), an argument was made that a request to "look through" an automobile may be impermissibly vague. *Id.* at 892. The court upheld the search, noting that the suspects "stood by and watched as the search was conducted." *Id.* at 892. The court concluded that "[f]ailure to object to the continuation of the search under these circumstances may be considered an indication that the search was within the scope of consent." *Id.* The same reasoning and result apply in this case.

Corral testified that he attempted to limit the consent when patrolman Gregory grabbed the luggage by telling him to "stay out of his personal things." Patrolman Gregory denies this. The court believes the patrolman's account of this event for several reasons. First, both Corral and patrolman Gregory relate an amiable discussion regarding racketball after certain racketball equipment was found in the first piece of luggage. Second, Corral admits that he told the patrolman that there may be a knife in the bag, although he does not know why he said that. (R. 360) Third, Corral does not claim to have told either Sgt. Johnson, patrolman Novak, or agent Hinton that he had tried to limit the consent to search. Fourth, while driving to Cheyenne with agent Hinton, Corral described patrolman Gregory as "real cool" and generally stated the view that he had done a good job. Finally, some other portions of Corral's testimony were unbelievable. Although he saw the suitcase (in which the money was found) in the trunk before leaving, he neither opened it nor sought out its owner. Instead Corral drove off with it, content "that later on whoever it belonged to would have said something about it." (R. 386)

## DETENTION

After patrolman Gregory discovered the $298,919, he handcuffed Corral and placed him in the barrow pit about fifteen feet from the car. Corral now contends that these actions constituted an arrest; the Government argues that they merely constituted an investigative stop.

An arrest is a seizure within the meaning of the fourth amendment. Arrests are "characterized by highly intrusive or lengthy search or detention." *Espinosa*, 782 F.2d at 891. Under certain circumstances, police conduct will amount to de facto arrest. *See, e.g., Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (airline passenger matching "drug courier profile" asked to accompany narcotics agents holding his airline ticket and driver's license to a "large storage closet" where he consented to a search of his bags that an agent had retrieved and brought to

the room); *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979) (suspect driven to police headquarters and placed in an interrogation room where he was questioned by officers after receiving *Miranda* warnings); *United States v. Recalde,* 761 F.2d 1448 (1985) (owner of speeding vehicle that officer had a "gut instinct" carried drugs was taken back to small room in police office where given *Miranda* warnings). Corral argues his detention on the roadside was a de facto arrest.

Before *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), "any restraint on the person amounting to a seizure for the Fourth Amendment was invalid unless justified by probable cause." *Royer,* 460 U.S. at 498, 103 S.Ct. at 1324 (citing *Dunaway,* 442 U.S. at 207–09, 99 S.Ct. at 2253–55). Creating a limited exception to this rule, *Terry* permitted "a stop and frisk for weapons" provided there is an "articulable suspicion that a person has committed or is about to commit a crime." *Royer,* 460 U.S. at 498, 103 S.Ct. at 1324. More precisely, Tenth Circuit case law requires that "specific and articulable facts and rational inference from those facts give rise to a reasonable suspicion that a person has committed or is committing a crime." *Espinosa,* 782 F.2d at 890.

In evaluating the reasonableness of a seizure, a court must balance the intrusion on fourth amendment rights with the importance of the governmental interests allegedly served. *United States v. Sharpe,* 470 U.S. 675, 682–83, 105 S.Ct. 1568, 1573–74, 84 L.Ed.2d 605 (1985). For a seizure to be permitted "the nature and extent of the detention [must be] minimally intrusive of the individual's Fourth Amendment rights...." *Id.* Otherwise stated, "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Royer,* 460 U.S. at 500, 103 S.Ct. at 1325.

In this case, the search of the automobile is not justified on a "stop and frisk" basis. To justify the search, the Government relies on Corral's consent. The Government

relies on "stop and frisk" to justify the handcuffing and placement of Corral in the barrow ditch, fifteen feet from his car. Had those two acts not occurred, there would be no need to rely on the investigative stop. In the ordinary case, the "stop" is to investigate the suspect and the "frisk" is to provide safety to the investigating officer. In this case, the "stop" had already occurred and continued for purposes of a consent search and the "frisk" was accomplished by handcuffing Corral and moving him fifteen feet from his car.

After patrolman Gregory located the $298,919 in cash, Corral could not explain his possession of it. The rational inferences from the facts gave rise to a reasonable suspicion of criminal activity. Therefore, the police could properly act within the bounds of a *Terry* stop. Yet, particularly after two backups had arrived, the handcuffing and placement of Corral in the barrow ditch were not "minimally intrusive" conduct. That was conduct equivalent to an arrest. *Cf. United States v. Blum,* 614 F.2d 537, 540 (6th Cir.1980) (suspect's freedom was sufficiently restricted to put him "in custody" when he was separated from his two companions and placed without handcuffs in a police cruiser); *United States v. Bourassa,* 411 F.2d 69 (10th Cir. 1969), *cert. denied,* 396 U.S. 915, 90 S.Ct. 235, 24 L.Ed.2d 192 (1969) (a lawful arrest occurred when a speeder who had been pursued eight blocks through town was handcuffed and placed in a patrol car even though, after questioning, the officer had decided to let him go); *United States v. Guarino,* 629 F.Supp. 320, 325 (D.Conn. 1986) (a suspect whose hands were handcuffed behind his back and who was surrounded by armed agents would reasonably consider himself "in custody").

## CUSTODIAL INTERROGATION

The fifth amendment protects against compelled self-incrimination. In *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Court announced certain procedural protections owed suspects undergoing custodial interrogation. The Court defined custodial interrogation

in terms of "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 444, 86 S.Ct. at 1612. Statements obtained from a suspect through custodial interrogation without benefit of the procedural protections were deemed inadmissible.

■ A traffic stop of a vehicle and detention of its occupants "constitute[s] a 'seizure' within the meaning of [the Fourth] Amendmen[t], even though the purpose of the stop is limited and the resulting detention quite brief." *Berkemer v. McCarty,* 468 U.S. 420, 436–37, 104 S.Ct. 3138, 3148, 82 L.Ed.2d 317 (1984) (quoting *Delaware v. Prouse,* 440 U.S. 648, 653, 99 S.Ct. 1391, 1395, 59 L.Ed.2d 660 (1979)). An ordinary traffic stop, however, does not exert "upon a detained person pressures that sufficiently impair his free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights." *Berkemer,* 468 U.S. at 438, 104 S.Ct. at 3149. Accordingly, all statements by Corral to patrolman Gregory up until he was handcuffed are admissible.

A traffic stop may be elevated to custody by later treatment rendering a suspect "in custody" for practical purposes. *Id.* at 440, 104 S.Ct. at 3150 (citing *Oregon v. Mathiason,* 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (per curiam)). *Miranda's* formal safeguards apply when a suspect's freedom of action is restricted to a "degree associated with formal arrest." *Berkemer,* 468 U.S. at 440, 104 S.Ct. at 3150 (quoting *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983) (per curiam). In deciding whether one is in custody, "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his position." *Berkemer,* 468 U.S. at 442, 104 S.Ct. at 315); *United States v. Chalan,* 812 F.2d 1302, 1306 (10th Cir. 1987). Corral was handcuffed and placed in the barrow ditch after the large sum of money was discovered. Two other officers soon arrived in separate vehicles. Under these circumstances, the court believes a reasonable person would then believe himself in custody.

In *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), the Court for the first time addressed the meaning of "interrogation" under *Miranda. Id.* at 297, 100 S.Ct. at 1687. The Court determined that *Miranda's* procedural protections apply "whenever a person in custody is subjected to either express questioning or its functional equivalent." *Id.* at 301, 100 S.Ct. at 1689. The Court found that

> the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

*Id.* at 301, 100 S.Ct. at 1689.

The interrogation that Corral complains occurred as he stood handcuffed in the barrow ditch occurred through express questioning. During this time, patrolman Gregory asked him if certain lapel pins found in the car belonged to him. His affirmative reply must be suppressed since it resulted from custodial interrogation without *Miranda* warnings having been given. A tape recording from patrolman Gregory's vehicle reflects that Corral was asked on his way to Albany County jail where he had been coming from. (R. 126) Apart from contradicting the patrolman's account of "general conversation" on that ride, this question was custodial interrogation. Nothing, however, indicates a response by Corral to this question. Consequently, no statement is available to be suppressed.

As patrolman Novak exited Corral's vehicle with the baggie in hand, Corral asked, "What's that?" Patrolman Novak responded, "What, this?" Corral replied, "That wasn't in the bag when I put the other things in there." Corral also made several statements to agent Hinton as he was being transported to Cheyenne, Wyoming. The court cannot find custodial interrogation led to these statements by Corral. In-

stead, they were voluntarily given. Voluntary statements are not barred by the fifth amendment. *Innis*, 446 U.S. at 299–300, 100 S.Ct. at 1688–1689 (quoting *Miranda*, 384 U.S. at 478, 86 S.Ct. at 1630). Having reviewed the record, the court finds no words or actions by Hinton or patrolman Novak that they should have known were "reasonably likely to elicit an incriminating response from the suspect." *Innis*, 446 U.S. at 301, 100 S.Ct. at 1689.

## PROBABLE CAUSE

### A. General Principles

In *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), the Court redefined its probable cause inquiry in terms of "totality of circumstances." 462 U.S. at 230, 103 S.Ct. at 2328. In doing so, it retreated from its previously adopted two-prong test, which had inquired into an informant's "veracity or reliability" and "basis of knowledge." Defending this result, the court observed that "[r]igid legal rules are ill-suited to an area of such diversity." *Id.* at 232, 103 S.Ct. at 2329.

The Court found that probable cause presented a "common sense, practical question." *Id.* at 230, 103 S.Ct. at 2328. The test was not defined in terms of a legal technician's knowledge, but instead in terms of "the factual and practical considerations of everyday life on which reasonable and prudent men ... act." *Id.* at 231, 103 S.Ct. at 2328. A magistrate's probable cause determination complies with the fourth amendment provided there was "a 'substantial basis for ... concluding' that a search would uncover evidence of wrongdoing." *Id.* at 236, 103 S.Ct. at 2331 (citations omitted).

### B. The Search Warrant

■ At the suppression hearing, Sgt. Evan Kohler of the Pittsburg, California, narcotics department testified to the events surrounding the search warrant. He told the court that he had written about ninety search warrants and viewed himself as having expertise in this area. (R. 255–57) Although the Government had produced only his affidavit for search warrant, Sgt. Koh-

ler insisted that this was in fact the search warrant. (R. 270, 283) Despite all his stated experience in this area, he informed the court that the affidavit was the only form of search warrant with which he was familiar. (R. 294) He testified that he had not seen search warrants entitled, "Search Warrant." (R. 294) The Government rested. The next day, the Government sought and received permission from the court to continue Sgt. Kohler's testimony. At that time, a copy of the search warrant, as opposed to the affidavit, was received. Sometime between the two court sessions the true search warrant had been found.

At 1:35 a.m. on 19 April 1988, municipal judge Belleci issued a search warrant to search 110 Northstar Drive, Garcia's bag, and the bag allegedly belonging to Rene Corral–Corral found in Hilario Corral's residence and brought to 110 Northstar Drive. The searches were justified by "GOOD CAUSE HAVING BEEN SHOWN by Affidavit...." The affidavit consisted of information contained in a felony report and two supplements. These reports detailed the stop of Corral, his consent to search the automobile, the fruits of the automobile search, and certain statements allegedly made by Corral.

Sgt. Kohler sought to establish probable cause by certain "suspicious circumstances." First, Sgt. Kohler felt that $4,000 was a suspiciously low price for a 1983 Thunderbird. He had no knowledge of the mileage or condition of the car. (R. 296–97) Second, Corral, a California resident, had bought a car registered in California outside of California. Third, Corral could not explain the large sum of cash. Fourth, four grams of cocaine were present in the car. Finally, Corral was enroute to California. (R. 296–301) Sgt. Kohler concedes that these circumstances do not individually tie into 110 Northstar Drive. He maintains, however, that together they do provide probable cause to search 110 Northstar Drive.

As noted in *Illinois v. Gates*, "probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even use-

fully, reduced to a neat set of legal rules." 462 U.S. at 232, 103 S.Ct. at 2329. This case presents a unique factual context. Based on self-proclaimed expertise, Sgt. Kohler offers his hunch that drugs may have been on the premises. This guess-work fares poorly in comparison to probable cause found in other cases. In *Illinois v. Gates,* for example, an informant alleged to know that drugs were in the suspect's basement, and many details in the informant's account were corroborated. 462 U.S. at 225–29, 103 S.Ct. at 2325–28. The stark contrast in probable cause between the two cases is seen from Sgt. Kohler's lack of knowledge that 110 Northstar Drive was even Corral's address. In the affidavit for search warrant, Sgt. Kohler erroneously stated that "[a]t the time of his arrest suspect Rene Corral gave his address as 110 Northstar Drive Pittsburg California." No one now contends that Corral made this statement. At the time the affidavit was filled out, police knew only that 110 Northstar Drive was the address listed on Corral's driver's license. Nothing in the affidavit indicates that Kohler learned the address belonged to defendant Corral. It does state that Cesar Garcia claimed to live there.

The Government offers no cases supporting the view that a small quantity of drugs and a large sum of money found in a vehicle pursuant to a consent search amount to probable cause to search a residence 1000 miles away. The cases located by the court do not support the Government's view of probable cause.

In *United States v. Gomez,* 652 F.Supp. 461 (E.D.N.Y.1987), the DEA conducted an undercover narcotics investigation. They determined the identities of two cocaine suppliers. Each suspect was arrested pursuant to warrant. In suspect Newbold's apartment, agents found records reflecting multiple kilogram transactions and numerous references to "Adela." In suspect Adela Gomez's apartment, agents observed gold jewelry and a telephone book containing the name and address of a co-defendant. Based on this information, a magistrate issued a search warrant for Adela Gomez's apartment.

The court found that probable cause did not support the warrant. It noted that

[t]he critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought.

*Id.* at 462 (quoting *Zurcher v. Stanford Daily,* 436 U.S. 547, 556, 98 S.Ct. 1970, 1976, 56 L.Ed.2d 525 (1978)). The court recognized that Newbold's drug records implicated Gomez in drug deals, that the telephone book contained the name of a co-defendant, and that old jewelry had been observed in Gomez's apartment. These facts, the court reasoned, did not establish that evidence of criminal activity would be located *in the apartment.* The facts in the case at bar are even less compelling than those in *Gomez.* Cf. *U.S. v. Smith,* 797 F.2d 836 (10th Cir.1986) (after drugs were found on a plane, a search warrant was obtained for the owner's residence, leading to discovery of other incriminating evidence; for whatever reason, the prosecution chose to rely only on evidence seized from the plane).

As stated in *Illinois v. Gates,* "courts must continue to conscientiously review the sufficiency of affidavits on which warrants are issued." 462 U.S. at 239, 103 S.Ct. at 2333. A magistrate must have a substantial basis to conclude that probable cause existed. *Id.* Based on the record before it, this court cannot defer to the magistrate's probable cause determination.

## C. The Seizure of 110 Northstar Drive

■ Seeking to justify the seizure of 110 Northstar Drive, the government relies on *Segura v. United States,* 468 U.S. 796, 797, 104 S.Ct. 3380, 3381, 82 L.Ed.2d 599 (1984). In that case, agents discovered that Segura and his girlfriend were trafficking cocaine from their apartment. Agents arrested Segura after he left the apartment and entered the lobby. With Segura in tow, the agents knocked on the apartment door and entered without permission when the door

was opened. After observing some drug trafficking items in plain view, the agents seized the premises for nineteen hours until a search warrant was obtained. *Id.* at 799–801, 104 S.Ct. at 3382–3384.

The Court began by distinguishing seizures from searches. While seizures affect only possessory interests, the Court reasoned, searches affect privacy interests. *Id.* at 810, 104 S.Ct. at 3388. The Court allowed such seizures "provided there is probable cause to believe that that property is associated with criminal activity." *Id.* at 808, 104 S.Ct. at 3387 (citing *United States v. Place,* 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983)). The Court found "abundant probable cause" based on weeks of surveillance and information provided by Segura's buyers. No corresponding probable cause exists in this case. Accordingly, the seizure of the premises was unjustified.

■ Seeking suppression of evidence ultimately obtained from Cesar Garcia and Hilario Corral, defendant Corral argues that this evidence was obtained directly from the unconstitutional seizure of 110 Northstar Drive. As noted in *Nix v. Williams,* 467 U.S. 431, 444, 104 S.Ct. 2501, 2509, 81 L.Ed.2d 377 (1984), however, a showing that challenged evidence is in some sense the product of illegal governmental activity does not end the inquiry. The evidence is admissible if the prosecution can by a preponderance of the evidence establish "that the information ultimately or inevitably would have been discovered by lawful means...." *Id.* Here, the court believes the same information would have been obtained had the officers approached Cesar Garcia and Hilario Corral as they approached the residence. Defendant Corral has no standing to contest the legality of the search of Hilario Corral's residence or Cesar Garcia's bag. *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).

### GOOD FAITH

■ In *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), the Court "modified somewhat" the exclusionary rule in the fourth amendment context. *Id.* at 905, 104 S.Ct. at 3411. Weighing "the costs and benefits of suppressing reliable physical evidence seized by officers reasonably relying on a warrant issued by a detached and neutral magistrate," the Court concluded "that such evidence should be admissible in the prosecution's case in chief." *Id.* at 913, 104 S.Ct. at 3415. Under the new rule, evidence obtained pursuant to a warrant would be suppressed "only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule." *Id.* at 918, 104 S.Ct. at 3418. Later, the Court identified one such purpose as deterring willful or negligent police conduct in the hope of instilling "a greater degree of care toward the rights of an accused." *Id.* at 919, 104 S.Ct. at 3418 (quoting *United States v. Peltier,* 422 U.S. 531, 539, 95 S.Ct. 2313, 2318, 45 L.Ed.2d 374 (1975)). The Court announced a rule against suppressing "evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant...." *Id.* at 922, 104 S.Ct. at 3420.

Suppression remains an appropriate remedy when an officer's reliance on a warrant issued by a magistrate is not objectively reasonable. In deciding "whether a reasonably trained officer would have known that the search was illegal despite the magistrate's authorization," a court may consider "all of the circumstances...." *Id.* at 922 n. 23, 104 S.Ct. at 3420 n. 23; *United States v. Leary,* 846 F.2d 592, 607 (10th Cir.1988). The Court listed several examples in which an officer could not reasonably believe a warrant was properly issued. One such instance is when "a warrant is based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence unreasonable.'" (Citations omitted). *Id.* at 923, 104 S.Ct. at 3421.

As noted in the previous section, no probable cause supported the search warrant for 110 Northstar Drive. Unlike other cases, including *Gates* and *Leon,* no investigation whatsoever had occurred at 110 Northstar Drive and no one claimed to

know that drugs were on those premises. Sgt. Kohler does not claim that any one of his "suspicious circumstances" relates to that address. Further, Sgt. Kohler erroneously stated in his affidavit that "[a]t the time of arrest suspect Rene Corral gave his address as 110 Northstar Drive Pittsburg California." No one now contends that Corral made this statement. At the time the affidavit was filled out police knew only that 110 Northstar Drive was the address listed on Corral's driver's license. In addition, Sgt. Kohler concedes that agent Hinton is erroneously listed as an attorney in the affidavit. (R. 277) Under all these circumstances, the affidavit was "so lacking in the indicia of probable cause as to render official belief in its existence unreasonable."

The Government relies on *United States v. Cook*, 854 F.2d 371 (10th Cir.1988), to support its good faith theory. That case resembles others in its differences from this one. In *Cook* a confidential informant told a detective that he had in the last three days been to an identified apartment at which he had observed Cook in possession of large sums of currency and several "paper decks" of cocaine. The informant told the detective that he had several times seen Cook there with cocaine. A day before the warrant was obtained a police officer had observed a lot of foot traffic near that apartment and learned that Cook occupied the apartment. At the time, Cook was on probation for possession of a controlled substance. Another detective learned that Cook had at least twice been arrested for possession of a controlled substance. These facts were all included in an affidavit for search warrant.

"Assuming but not holding that the affidavit fails to establish probable cause," the court held that "the detective's reliance on the judge's probable cause determination and on the technical sufficiency of the warrant was objectively reasonable." *Id.* at 372, 374. If anything, *Cook* reinforces this court's view that the affidavit at bar was "so lacking in indicia of probable cause as to render official belief in its existence unreasonable." Unlike *Cook* and other cases, no one claims to know of drugs at 110 Northstar Drive, and no surveillance was conducted there. *Cf. U.S. v. Chavez*, 812 F.2d 1295, 1299 (10th Cir.1987); *United States v. Swingler*, 758 F.2d 477, 490–91 (10th Cir.1985).

The Government might also have prevailed had it been able to show that Corral had recently had drugs in his possession other than the four grams of cocaine found in the car. In *United States v. Medlin*, 798 F.2d 407 (10th Cir.1986), a confidential informant revealed that he had sold about thirty stolen guns to a man called "Tiny" between June 1983 and June 1984. The informant, who in the past had been reliable, identified a photo of Medlin as the buyer. Medlin had previously been convicted of the federal felony of dealing in firearms without a license. Medlin had no place of business. After obtaining a search warrant based on this information, agents searched Medlin's home and seized numerous guns.

The court found that "[t]he agent's reliance on the magistrate's issuance of the warrant was objectively reasonable." *Id.* at 409. The court pointed to facts contained in the affidavit, including the reliable informant's statement that he had sold illegal weapons to Medlin, and the corroboration by identification of Medlin's photograph and the informant's possession of Medlin's phone number. Upon a showing that Medlin had no place of business, the court found it "objectively reasonable for [the agents] to conclude that any weapons he might have would be at his residence." *Id.* In reaching this conclusion, the court observed that "[c]ourts frequently have relied on the expert opinion of officers in determining where contraband might be kept." *Id.*

In circumstances in which one claiming knowledge says that another has contraband, the court agrees that an expert might be relied upon to say where it is located. This case is not so simple. Before giving his opinion where Corral would keep drugs, the offered expert, Sgt. Kohler, first assumes Corral has other drugs. It is this assumption that distinguishes this case and renders Sgt. Kohler's reliance on the warrant objectively unreasonable. No

one claimed knowledge either that Corral had drugs other than those in the car or that he had no place of business. The court also notes that, unlike guns, drugs are easily disposed of.

For the above reasons, the Court ORDERS that evidence obtained from the search of 110 Northstar Drive be SUPPRESSED, and that Corral's statement that the lapel pins found in the car belonged to him be SUPPRESSED.