**UNITED STATES of America, Plaintiff,**

v.

**Walter SHELTON, John Rexius, Gary Harshfield and Lindsey Tilton, Defendants.**

**No. CR89–0102J.**

United States District Court,
D. Wyoming.

June 18, 1990.

John Barksdale, Asst. U.S. Atty., Casper, Wyo., for U.S.

Ronald Rogers, Cheyenne, Wyo., for Shelton.

Frank Chapman, Casper, Wyo., for Rexius.

James Fagan, Casper, Wyo., for Harshfield.

Jerry Yaap, Casper, Wyo., for Tilton.

## MEMORANDUM OPINION AND ORDER ON DEFENDANT'S MOTION TO SUPPRESS

ALAN B. JOHNSON, District Judge.

THE ABOVE CAPTIONED MATTER came before the court on Defendants John Rexius's and Walter Shelton's 14 and 15 November 1989 Motion to Suppress, and hearing was held on January 3, 4, 12, and February 9, 1990. After an extensive evidentiary hearing, the Court granted the defendants' motion to file supplemental briefs in support of the motion, which were filed with the court on 30 April 1990.

### FACTS

On June 1, 1989, the Casper Police Department turned over to the Wyoming Department of Criminal Investigation an ongoing investigation of the narcotics dealing which is the subject of this case. For the purposes of this motion, only those events which occurred between June 1 and July 24, 1989, are relevant. The drug transactions which were participated in and observed each followed a similar pattern.

On June 6, 1989, Agent Pat Carr of the Casper Police Department contacted defendant Gary Harshfield and told him that he would like to purchase two ounces of cocaine. Carr and Special Agent Al Bennett of the Wyoming DCI went to Harshfield's residence that afternoon to procure the narcotics. Harshfield informed the agents that he was having difficulty locating a source for the drugs at that time, but he left his apartment and on returning told them he had located one.

Surveillance was being conducted on Harshfield at that time by other agents of the DCI. Agent Tim Hill, the team leader of the Central Drug Enforcement Team, testified concerning that and all other surveillance conducted by the agency during the investigation. Upon leaving his apartment, Harshfield had driven to the house at 313 Siskin Street in Casper. That house was later identified as the residence of the defendant John Rexius. Harshfield stayed for a few minutes, and after running several errands, returned to his apartment and met with Bennett and Carr. He informed them that his source did not have the two ounces of cocaine at that time.

Agent Carr phoned Harshfield again on June 19 and informed him that Bennett would like to purchase two to four ounces of cocaine. Harshfield contacted Bennett and the two met that afternoon. Bennett gave him approximately half of the $2900 "buy money" with the understanding that Harshfield would retrieve at least half of the cocaine, and the remainder of the money would be paid at that time. Harshfield

left his apartment and went to 313 Siskin, stayed a few minutes and returned home. He told Bennett that the deal would take about an hour. Harshfield later left "to go to his connect's house" and his vehicle was again located at the Siskin residence. He and Rexius both left the house shortly thereafter, and surveillance lost Rexius. Harshfield returned to his apartment where he gave Bennett the first ounce of cocaine, and told him that his source was going to pick up the rest. Bennett was asked to return later. Soon thereafter, Rexius (whom surveillance had again located at his home) and Harshfield left their houses and met in a parking lot not far from Harshfield's apartment. They drove separately to the 313 Siskin address, and after a few minutes, Harshfield left and delivered another ounce of cocaine to Bennett.

On June 29, 1989, Agent Carr contacted defendant Lindsey Tilton in an attempt to locate Harshfield. Harshfield soon returned the call and Carr informed him that he was interested in purchasing four or more ounces of cocaine. Harshfield told Carr over the phone that he would check with his connect, and immediately after placing the call drove to 313 Siskin. He stayed approximately four minutes and drove home, stopping for food in between. Bennett and Carr arrived shortly thereafter. Harshfield told them that he was getting phone calls from his connect, and that the transaction would have to be complete before the connect had to work. About thirty minutes after the agents left, Harshfield drove to Rexius's house, and then back to his apartment. Rexius then left his home and again surveillance was not able to follow him.

Harshfield met the two agents and told them that he was going to meet his source at 4:00 p.m. At 3:47 p.m., he left his home and returned to 313 Siskin for several minutes, and on returning delivered one ounce of cocaine to Bennett and Carr. He told the agents that he could get an additional three ounces that afternoon, and Bennett agreed to pay half of the $5,700 price up front and the balance on delivery. Shortly, Harshfield and Rexius again met in a supermarket parking lot near Harshfield's

home and the two proceeded to the apartment. Harshfield delivered three ounces of cocaine to the agents, and after receiving the remaining half of the payment, met with Rexius in the alley behind the residence.

The final transaction between the parties occurred on July 24, 1989. Carr again contacted Tilton, who set up a meeting. At 12:15 p.m., the two agents met with Harshfield and Tilton at Harshfield's apartment. Harshfield informed them that his connect would sell them eight ounces of cocaine for $10,000. Bennett agreed to put together what money he could, and asked whether some of the cocaine would be "fronted" to him. Harshfield agreed to check with his connect, and arranged to meet with the agents at 3:30 p.m.

At approximately 3:00 p.m., Tilton arrived at 313 Siskin, stayed a few minutes, and drove to Harshfield's apartment. After Tilton's visit, at 3:30 p.m., Rexius left his home and picked up a person at a local body shop. He transported that person to a vehicle at the Casper airport terminal, then left the airport and at 4:30 p.m. drove to the Riverside Mini Storage facility.

Officers Chris Carter and Gerald Vanderheid were on surveillance of Rexius at this time, and saw him enter the storage area, where he remained for several minutes. Officer Vanderheid saw Rexius in front of an open storage unit, and observed him enter "one of about four" sheds. Rexius left the storage area and returned to his home, arriving shortly before 5:00 p.m.

Harshfield and Tilton met the agents at 3:42 p.m. at Harshfield's residence. Harshfield told them that his connect would not front any cocaine, but would sell eight ounces for $10,000. He also indicated that his connect had to go somewhere to pick up the cocaine. Harshfield left to see if his source was home, and surveillance followed him to 313 Siskin. At this time, Rexius was en route to the mini storage, and Harshfield returned to his apartment, telling the agents that his source had not yet arrived. Tilton and Harshfield left the apartment at 4:52 p.m. and arrived at Rexius' home as he was returning. They

stayed for approximately seven minutes and went back to their apartment. Harshfield informed Bennett that his connect would sell six ounces of cocaine for $8,000, and Bennett agreed to the deal. Harshfield told the agents that his connect had only four ounces and would have to go somewhere and get the remainder.

After Harshfield and Tilton left 313 Siskin, an individual identified as Adrianne Whistler arrived and she and Rexius proceeded to the Riverside Mini Storage area. Investigator Scott Weischedel of the Casper Police Department was conducting surveillance at that time and placed Rexius in the same area where he had previously been seen. Rexius and Whistler then returned to 313 Siskin and Rexius met Harshfield. Harshfield was observed putting something in his car, and then entered the house and remained for a few minutes. He returned to his apartment and delivered cocaine to Bennett.

At approximately 6:00 p.m., an arrest order was given and Harshfield and Tilton were arrested at their apartment. An arrest order was also given for Rexius, who was arrested with Whistler while driving in Casper. In a search of Rexius's person incident to his arrest, Investigator Scott Weischedel recovered a small set of keys from Rexius's shorts pocket. On the ring was a distinctive Master lock-type key.

At the hearing, each officer was questioned extensively on the subject of the keys. The testimony indicated that two sets of keys were seized. A set was found in Rexius' pocket and a ring of keys was in the ignition of his truck when he was arrested. In addition, a single key to the truck was found in its console when it was inventoried. As of the dates of the suppression hearing, none of the officers who testified could account for the location of any of the keys, and none had inventory records of any but the single pickup key. Although defense counsel exhaustively examined each witness on the subject of the keys, their whereabouts, the number of keys, where and when they were located, and their eventual destiny, the Court finds no particular significance in the "mystery." The testimony outlined the preceding facts

consistently, and no evidence was presented to the contrary.

Rexius and Whistler were taken to the Casper Police Department and questioned. At approximately 8:00 p.m., Agents Carter and Lynn Koughe drove Whistler to the Riverside Mini Storage and she pointed out two storage sheds, one of which Rexius had been to. She was apparently unsure of which of the two it was. On returning to the station, Carter was given the set of keys with the Master-type key and told to return to the storage area and determine whether the keys fit any of the locks on the sheds. Carter tried the key in shed # 365 and the lock opened. He then relocked the lock without opening the shed, and remained at the area awaiting word that a search warrant had been obtained. At the same time, agents were "sitting on" the residence at 313 Siskin, also waiting for a search warrant.

At approximately 11:00 p.m., Agent Bennett completed the affidavits and search warrants and presented them to Wyoming District Judge Harry Leimback. The affidavits contained the relevant information from the undercover agents and surveillance which had been conducted on July 24, 1989. They did not include information from the other buys. Judge Leimback read the cover pages, affidavits and warrants for both locations. After ten to fifteen minutes, and without any substantive questions for the officers, Judge Leimback signed the warrants, also authorizing their execution at any time, day or night. At approximately 11:40 p.m., officers who had secured the residence and the shed were informed that the warrants had been signed and the searches commenced. The search of the storage shed yielded 28 ounces of cocaine. Approximately $7000 of outstanding "buy money" was retrieved from the residence, as well as some fireworks, an answering machine tape and three firearms.

The four defendants were charged jointly with conspiracy to possess with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1), and conspiracy to distribute cocaine in violation of 21 U.S.C. § 841. De-

fendants Shelton and Rexius were additionally charged with possession of twenty-eight ounces of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B). Harshfield was additionally charged with distribution of six ounces of cocaine and Tilton with aiding and abetting that crime, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C), and 18 U.S.C. § 2.

The defendants now ask this court to suppress any evidence seized from Rexius's person at the time of his arrest and in the search of the house at 313 Siskin and Riverside Mini Storage shed # 365. They contend initially that the seizure of defendant Rexius' keys incident to his arrest was without probable cause or warrant. Any evidence obtained through the exploitation of this improper seizure, the defendants argue, is the fruit of an illegal seizure and should be suppressed. The defendants also ask the court to find that inserting the keys obtained from Rexius into the lock at Riverside Mini Storage was a search pursuant to the fourth amendment, and lacking warrant or probable cause, such search was improper.

The defendants also allege that the affidavits provided to Judge Leimback were insufficient on their face to establish probable cause to issue either search warrant. It is further argued that the affidavits did not make an adequate showing of special circumstances justifying the execution of the search warrants at night. Finally, the defendants contend that the executing agent knew or should have known of the deficiencies in the warrant, and did not therefore rely on the search warrants in good faith. The defendants allege that because the searches and seizures were otherwise illegal, the improper actions of the investigating agents and Judge Leimback cannot now validate them.

Because the Court finds that the affidavits submitted to Judge Leimback had sufficient facts with which to establish probable cause, the question of whether the officers acted in good faith in relying on his determination does not require resolution.

## THE SEIZURE OF REXIUS'S KEYS

 The defendant does not challenge the validity of the search of Rexius' person incident to his arrest. Instead, he relies on *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), for the proposition that, before items discovered in a search incident to lawful arrest may be seized, there must be probable cause to believe that those items either were weapons capable of use to resist arrest or effect escape or were fruits or instrumentalities of a crime. *Chimel* does not stand for that proposition. The Court discussed those rationale for allowing a warrantless search incident to a lawful arrest, but did so only in terms of limiting the physical parameters of such a search. Thus, the search of persons incident to their arrest is not limited by the motivation of the officer conducting the search, nor by the existence or non-existence of cause to believe the search will produce the fruits or instrumentalities of a crime or evidence. As the Court stated in *United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973):

> The authority to search the person incident to a lawful custodial arrest, while based upon the need to disarm and discover evidence, does not depend on what a court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found upon the person of the suspect. A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification.

*Id.*, at 235, 94 S.Ct. at 477.

What is novel about the defendant's contention is that he is challenging the seizure of evidence, and not the right of the officers to search, which is the focus of the *Chimel* decision. In the cases the Court can locate which concern the seizure of an individual's keys, the validity of the police action is consistently discussed in terms of the right of the police to search, and rarely in terms of a right to seize. *See, e.g., United States v. Baumwald*, 720 F.Supp. 226, 232 (D.Me.1989) ("The Court will not suppress the key since it was made [sic] during a search incident to ... custodial arrest."); *United States v. Grandstaff*, 813

F.2d 1353, 1357 (9th Cir.1987) ("The evidence *seized* from the Brown's person—including the cash and the keys to the Bronco—is not suppressible in any event. Brown's arrest was lawful, having been made pursuant to a valid arrest warrant. Therefore, the *search* incident to Brown's arrest was lawful." (emphasis added)); *United States v. Colonia,* No. 87 CR 376, 1987 WL 16240 (N.D.Ill. Aug. 19, 1987) (LEXIS, Genfed library, Dist file) (denying suppression of keys because search was valid); *United States v. Moses,* 796 F.2d 281, 284 (9th Cir.1986) (discovery of a key to a car trunk "was valid as a *search* incident to arrest." (emphasis added)); *United States v. Perez,* 574 F.Supp. 1429 (E.D.N.Y.1983) (seizure of keys from defendant's person was lawful because, if defendant was searched, it was lawful as incident to arrest); *United States v. MacDonald,* 670 F.2d 910 (10th Cir.1982) (upholding a seizure of defendant's keys and other items as a search incident to arrest); *United States v. McCool,* 526 F.Supp. 1206 (M.D.Tenn.1981) (refusing to suppress defendant's keys where arrest was lawful and seizure of keys was incident to that arrest); *United States v. House,* 604 F.2d 1135, 1142 (8th Cir.1979) (finding seizure of defendant's keys independently valid because they "were seized incident to appellant's lawful arrest."). Each of these decisions apparently assumes that the right to search incident to a lawful arrest also includes the right to seize those personal effects, including an individual's keys, which are in that person's possession. In no case was additional probable cause required for the seizure of items discovered in a search incident to a lawful arrest. *See also Wright v. Edwards,* 343 F.Supp. 792 (N.D.Miss.1972) (refusing to require that probable cause or a warrant is required before contraband, which is discovered pursuant to a lawful search, may be seized).

The suggestion of the defendant that only items which are fruits or instrumentalities of a crime or contraband may be seized is clearly wrong. In *Warden v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), the Supreme Court rejected the notion that purely evidential items may not be seized pursuant to a lawful search. The Court did require that cause to seize exist, and enunciated the standard to apply.

> There must, of course, be a nexus—automatically provided in the case of fruits, instrumentalities or contraband—between the item to be seized and criminal behavior. Thus in the case of "mere evidence," probable cause must be examined in terms of cause to believe that the evidence sought will aid in a particular apprehension or conviction.

*Warden,* 387 U.S. at 307, 87 S.Ct. at 1650. Although it has been suggested that the courts are reluctant to apply this reasoning in cases involving the seizure of items found on the person, 2 LaFave, Search and Seizure, § 5.2(j), at 476 (2d ed. 1987), this Court has no difficulty in so applying the rule.

In *United States v. House,* 604 F.2d 1135 (8th Cir.1979), the court addressed a situation where the defendant's car keys were seized from his person. Although a warrant had not yet been obtained to search his car, there was cause to believe that contraband could be found there. Applying the standard in *Hayden,* the court found that the seizure was permissible because the keys were mere evidence of the defendant's constructive possession and control of the automobile and its contents. *Id.,* at 1142. Similarly, in *United States v. DeLeo,* 422 F.2d 487 (1st Cir.1970), the defendant was taken to FBI headquarters where agents seized a safe deposit envelope and key. The defendant was lawfully arrested for robbery, and the items seized merely indicated that he had, since the robbery, rented a safe deposit box. Applying *Hayden,* the court upheld the seizure, finding that "the evidence here of the newly rented safe deposit box could lead the FBI reasonably to believe that it would reveal the loot or the instruments of the crime." *Id.,* at 493.

At the time of Rexius's arrest the officers were already aware, due to earlier surveillance, that he had left his residence on several occasions after the arrival of either Harshfield or Tilton, and at least two of these times had gone to the Riverside

Mini–Storage facility. Because the surveillance team had lost contact with him on the other occasions, they could not discount the possibility that he had gone to the storage area then, as well. Each time Harshfield or Tilton arrived, they had left their residence to meet with their source. The Court finds that, given these circumstances and the discovery of a padlock key or keys on the defendant's person, an officer of reasonable caution could conclude that the seizure of those keys would aid in a particular conviction. The keys would be valuable evidence to show control over the storage area, the availability of access to the defendant, or to provide evidence supporting the inference that the defendant had indeed entered the unit to retrieve contraband.

Although the Court does not decide the issue, the seizure of keys could, as conceded by the defendant, be valid for the purpose of an inventory of the arrestee's possessions. In *United States v. Thompson*, 837 F.2d 673 (5th Cir.1988), the Court held that the defendant, once lawfully arrested, "has no reasonable expectation of privacy with respect to property properly taken from his person for inventory by the police." *Id.*, at 674. Thus, when a federal agent discovered two keys which were seized from the defendant in an inventory of his personal effects, the agent's actions in examining the defendant's effects and matching those keys with a storage unit containing contraband were not in violation of the fourth amendment. *See also United States v. Edwards*, 415 U.S. 800, 807, 94 S.Ct. 1234, 1239, 39 L.Ed.2d 771 (1974); *United States v. Grill*, 484 F.2d 990 (5th Cir.1973) (matching a key found in defendant's personal effects with a particular lock was not unlawful).

■ Finally, assuming arguendo that the seizure of the keys was constitutionally impermissible, suppression of the contraband discovered at either the defendant's residence or storage unit would not be an appropriate remedy. The defendant does not advise the Court why an improper seizure would in any way taint the search of his residence. The keys' investigatory value was limited only to determining which of three storage units identified by Special

Agent Vanderheid, narrowed to two by Adrianne Whistler, was the one to which the defendant had access. The finding by Judge Leimback that probable cause existed to search the defendant's residence and storage shed would have authorized the searches with or without the seizure of the keys. If the contraband discovered by the search of the storage shed was the fruit of an illegal seizure, but the agents would have lawfully discovered the evidence later, the evidence would be admissible under the inevitable discovery doctrine. That rule, enunciated in *Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), recognized that an exception to the exclusionary rule was needed when the effect of excluding evidence would be to place the police in a worse position, not the same, than had the misconduct not occurred. *Id.*, at 443, 104 S.Ct. at 2508–09. While the Court should be wary of speculating on the success of a hypothetical investigation, the danger in doing so "is diminished when, as here, the evidence clearly would have been discovered within a short time through a lawful investigation already underway." *United States v. Romero*, 692 F.2d 699, 704 (10th Cir.1982). Such is plainly the case here.

## THE OPENING OF THE PADLOCK ON SHED #365

■ The defendant next contends that the insertion of his padlock keys into the lock on shed #365 without consent, probable cause, exigent circumstances or warrant was an unreasonable search, and evidence obtained as a result of this act must be suppressed.

In *United States v. Lyons*, 898 F.2d 210 (1st Cir.1990), the First Circuit addressed a situation strikingly similar to the present case. In a search of the defendant incident to his arrest, officers discovered a ring of keys with two indistinct padlock keys. From information gathered earlier and from a search of the defendant's briefcase, the agents found information linking defendant to a storage locker which had been rented at a mini-storage facility. Agents went to the storage compartment, and inserted and turned one of the defen-

dant's keys in the tumbler. The padlock was relocked without the compartment being opened. After procuring a search warrant, the agents commenced a search which yielded contraband.

The court in *Lyons* held that the insertion of a key into a padlock, without more, did not constitute a search. The defendant in that case, the court found, had no reasonable expectation of privacy in the identification of the padlock, but merely in the contents of the storage unit itself. While the defendant in this case has suggested that the insertion of the key may not have been merely to identify the storage unit to which the defendant had access, there is no evidence that any further action was taken until a search warrant was procured.

The Ninth Circuit took a slightly different approach in *United States v. Grandstaff*, 813 F.2d 1353 (9th Cir.1987), where a defendant challenged the insertion of a key into his Ford Bronco without a further search. That court assumed that the insertion was a search, but found that the intrusion upon the defendant's privacy was reasonable, noting that the act was undertaken merely to identify which car belonged to the defendant. This, without opening the door or searching the vehicle, was found minimally intrusive.[1] Faced with a similar factual setting, the court in *United States v. DeBardeleben*, 740 F.2d 440 (6th Cir.1984) held that inserting a key into the door of an automobile to identify it as one belonging to the defendant was not a search of the automobile. The court stated:

> [T]he insertion of the keys into the Chrysler was merely a minimal intrusion, justified by a "founded suspicion" and by the legitimate crime investigation. The agent, acting on a reasonable belief that the car belonged to defendant, did not *search* the Chrysler but merely *identified* it as belonging to defendant.

*Id.*, at 445 (emphasis in original).

The defendant contends that, until the key was inserted, the police had no probable cause or founded suspicion. While the Court disagrees with that proposition, the question does not need to be addressed. Nor does the Court find benefit in the intellectual exercise of distinguishing "between 'no search' and 'search but not unreasonable,'" *United States v. White*, 766 F.2d 1328 (9th Cir.1985), where, as here, the Court finds no legitimate expectation of privacy has been infringed. Presumably, the defendant's reference to "the enhanced expectations of privacy attendant to such a shed" is the expectation that the contents stored in the shed would be safe from exposure to the public. There has been no showing that the defendant had any expectation that his identity as the lessor of the storage unit would be free from public scrutiny. This Court does not find that society is prepared to recognize as reasonable such an expectation. Consequently, no fourth amendment interest was violated where none attached.

## THE SUFFICIENCY OF THE AFFIDAVITS TO ESTABLISH PROBABLE CAUSE

■ Initially, the Court notes that the argument forwarded is applied only the search of the storage shed. There is apparently no challenge to the search of Rexius' residence based on the insufficiency of information in the affidavits accompanying the search warrants. The affidavits being substantially the same, however, the Court will assume that the defendant does not waive that argument and its probable cause findings are applicable to that search as well.

As the Tenth Circuit noted in *United States v. Matthews*, 615 F.2d 1279 (10th Cir.1980), whether probable cause exists is a determination to be based on the facts of each particular case. *Id.* at 1283. *See also United States v. Espinosa*, 771 F.2d 1382, 1407 (10th Cir.1985); *United States v. Hansen*, 652 F.2d 1374 (10th Cir.1981). "Probable cause exists where the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable

---

**1.** The *Grandstaff* court independently validated the search based upon the "automobile exception," finding that probable cause existed to search the defendant's automobile.

caution in the belief that an offense has been or is being committed." *Hansen*, 652 F.2d at 1388, citing *Matthews*, 615 F.2d at 1284; *United States v. Borrelli*, 621 F.2d 1092, 1095 (10th Cir.1980). Based on two affidavits presented to him by Special Agent Bennett, Judge Leimback found that an officer of reasonable caution would have sufficient facts or knowledge to believe that an offense had been or was being committed which would justify the search of the residence at 313 Siskin and the Riverside Mini Storage shed.

 When a magistrate has made a finding of probable cause to issue a search warrant, this court must review that finding with "great deference," *Illinois v. Gates*, 462 U.S. 213, 236, 103 S.Ct. 2317, 2331, 76 L.Ed.2d 527 (1983); *United States v. Orr*, 864 F.2d 1505, 1508 (10th Cir.1988), and the finding is not subject to de novo review. *United States v. Corral–Corral*, 899 F.2d 927, 931 (10th Cir.1990). "In the absence of an allegation that the magistrate abandoned his detached and neutral role, suppression is appropriate only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause." *United States v. Leon*, 468 U.S. 897, 926, 104 S.Ct. 3405, 3422, 82 L.Ed.2d 677 (1984). This does not mean that the reviewing court should always show deference to a magistrate's finding. First, a court should not defer to the issuance of a warrant based on "an affidavit that does not 'provide the magistrate with a substantial basis for determining the existence of probable cause,' " *Leon*, 468 U.S. at 915, 104 S.Ct. at 3416, quoting *Gates*, 462 U.S. at 239, 103 S.Ct. at 2332. Second, the court must insist that the magistrate display neutrality and detachment. *Id.* 468 U.S. at 914, 104 S.Ct. at 3416. A magistrate acting merely as an appendage of law enforcement and "rubber stamping" a warrant cannot, by the issuance of that warrant, validate an otherwise unconstitutional search. *Lo–Ji Sales, Inc. v. New York*, 442 U.S. 319, 326, 99 S.Ct. 2319, 2324, 60 L.Ed.2d 920 (1979).[2]

The defendant does not now contend that the magistrate abandoned his neutral and detached function, presumably because no evidence of such was presented to the Court. This Court must determine, then, whether the affidavits provided a substantial basis upon which to determine that probable cause existed. Absent any obvious failure to meet this requirement, the court must rely on the magistrate's determinations. *United States v. Lamport*, 787 F.2d 474 (10th Cir.1986).

The defendant's characterization of the facts provided by the affidavit and within the officer's knowledge is simply not supported by the record. The affidavits provided to Judge Leimback contained a summary of the observations of the defendants' activities on July 24, as recorded by the surveillance team. The chronology initially discusses the first meeting on that date between the Agents Bennett and Carr, and Harshfield and Tilton. It then recites the relevant events observed by the surveillance team: Tilton's visit to 313 Siskin; Rexius leaving his home and eventually going to the storage facility; Harshfield telling the agents that his connect had gone somewhere to get cocaine; Harshfield, Tilton and Rexius meeting at 313 Siskin; Harshfield relaying to the agents that his connect had four ounces of cocaine and had to go somewhere to get the remainder; Rexius's second trip to the mini-storage, where he was sighted near one of three lockers; Harshfield receiving $8,000 buy money from the agents and again meeting Rexius at 313 Siskin; Harshfield delivering six ounces of cocaine to the agents; and the matching of a key found on Rexius's person with the padlock on locker # 365 at the storage unit. Based on this information and the experience of Bennett as a narcotics officer, the Court finds that a

---

**2.** There is no allegation here that the affidavits contained statements which were knowingly or recklessly false. That is the first situation where a reviewing court may suppress evidence obtained pursuant to a search warrant. *Leon*, 468 U.S. at 914–16, 104 S.Ct. at 3416–17. The defendants do propose that the court find that Bennett knew or should have known that the information contained in the affidavits was an insufficient basis for probable cause. That argument, however, goes to the "substantial basis" requirement.

magistrate could have found a substantial basis for probable cause to exist to search both the residence and the storage shed.

The defendant's contention rests largely on a comparison of the affidavits produced in two other cases and those produced in the present one. Although the defendant depicts the probable cause provided by the affidavits in *Corral–Corral* and *United States v. Cook*, 854 F.2d 371, 373 (10th Cir.1988), as substantially more than was provided here, this is clearly not the case. In *United States v. Corral–Corral*, 702 F.Supp. 1539 (D.Wyo.1988) *rev'd on other grounds*, this Court noted, and the officer who drafted the affidavit in support of that warrant admitted, that none of the "suspicious" circumstances surrounding Corral's arrest in Wyoming were at all connected to his residence in California. *Id.* at 1547. The Court found no probable cause existed where the evidence consisted of a large amount of cash and a small amount of cocaine, and the residence to be searched was over one thousand miles away. *Id.* at 1548.

The defendant points to eight documents presented to the magistrate in *Corral–Corral*, purportedly in support of cause to search the defendant's residence. Despite the number of documents, the Tenth Circuit found that the totality of the evidence supporting probable cause was the amount of money and small amount of cocaine in the defendant's possession, some allegedly suspicious statements of the defendant's cousin, and the experience of the attesting officer. *Corral–Corral*, 899 F.2d at 936–37.

Contrasting the above facts to those in the present case, the evidence obtained from surveillance appears even stronger. Rexius was observed going to a storage shed on two separate occasions when agents had been informed that Harshfield's connect had to "go somewhere" to get cocaine. A key on Rexius's person matched the lock on shed #365. These facts alone are sufficient to distinguish this situation from that in *Corral–Corral*, where this Court's primary concern was the lack of a nexus between the suspicious circumstances and the residence to be searched.

In *Cook*, the district court found that an affidavit did not provide probable cause where it relied almost exclusively on information from a confidential informant, yet provided no corroboration of the information, no facts indicating his reliability, no statement that there was a recognizable quantity of cocaine, and no definition of the type of packaging the informant had allegedly seen. *Cook*, 854 F.2d at 374. The present case is readily distinguishable in that the affidavit did not rely on information from sources requiring indicia of reliability or corroboration.

While it is true that no officer had actually seen any drugs near the shed nor seen Rexius possess any drugs, it does not follow that there was not probable cause. Probable cause does not require enough evidence to justify condemnation, *Corral–Corral*, 899 F.2d at 930–31, but merely enough so that a reasonable and prudent officer versed in the field of law enforcement would be justified in acting. This is admittedly a marginal case, where reasonable men may differ as to whether the affidavit establishes probable cause. In such an instance, however, this Court will not substitute its judgment for that of the magistrate, but should defer to his findings, keeping in mind the strong preference for searches conducted pursuant to a warrant. *Leon*, 468 U.S. at 914, 104 S.Ct. at 3416.

## EXECUTION OF THE WARRANTS AT NIGHT

The defendant claims that the execution of the search warrants in the nighttime hours violates Wyo. Stat. § 35–7–1045(d) (1977), and, presumably, all evidence seized pursuant to the warrants should therefore be suppressed. That section provides in pertinent part:

(d) A search warrant relating to offenses involving controlled substances may be served at any time of the day or night if the judge or district court commissioner issuing the warrant is satisfied that there is probable cause to believe that grounds exist for the warrant and for its service at such time.

One of two cases interpreting this statute is the Tenth Circuit's decision in *Mason v. United States*, 719 F.2d 1485 (10th Cir. 1983). That decision upheld the Wyoming District Court's denial, based on the above law, of a suppression motion. The court noted initially that there is no difference between the language in this statute and its federal counterparts, Fed.R.Crim.P. 41(c) and 21 U.S.C. § 879(a). The Supreme Court's decision in *Gooding v. United States*, 416 U.S. 430, 94 S.Ct. 1780, 40 L.Ed.2d 250 (1974) construed those provisions, and held that the more specific statute did not require a special showing for a nighttime search. A showing that contraband is likely to be on the property or properties to be searched was said to be adequate. Like its federal counterparts, the circuit court held that the Wyoming statute allows nighttime searches based on probable cause alone in situations involving controlled substances, without any additional special showing.

In *Ehrenborg v. State*, 639 P.2d 886 (Wyo.1982), the Wyoming Supreme Court addressed, in dicta, § 35–7–1045(d), one year prior to the decision in *Mason*. Although the Tenth Circuit said in *Mason*, 719 F.2d at 1489, that "[t]he Wyoming court has not interpreted [§ 35–7–1045(d) ]," that finding was in error.[3] The Wyoming court not only discussed that statute, but attributed to it a more restrictive reading than that of the Tenth Circuit, requiring that an additional showing be made justifying service of a warrant at night.

The language of § 35–7–1045(d) is plain and unambiguous. It neither authorizes nor prohibits the issuance of search warrants in controlled substance cases. Rather, it places a condition on nighttime service of such a warrant, i.e., there must be "probable cause to believe that grounds exist * * * " for its service at such time.

*Ehrenborg*, 639 P.2d at 887 (citation and footnotes omitted).

In footnote, the court referred to the Wyoming Rules of Criminal Procedure, which also require an additional showing for service at night.

Rule 40(c), W.R.Cr.P. contains a similar requirement: " * * * The warrant shall direct that it be served in the daytime, but for good cause shown the warrant may direct that it be served at any time. * * * "

*Id.*, at 887 n. 6. The court did not find, as did the Supreme Court in *Gooding*, that the more specific statute superseded the more general rule. Rather, it read the two provisions in tandem, as placing an additional condition on the authorization of service at night.

▮ This Court heard evidence that the approximately eight thousand dollars in buy money was suspected to be in the residence at 313 Siskin. While there may have been adequate cause to justify execution of the warrant at night,[4] that evidence was not presented to the magistrate in the affidavits. There is no evidence that Judge Leimback asked any questions which would have elicited that information from the agents. The statute is specific that such a finding, that cause exists for service at night, be made by "the judge or district

---

**3.** The Tenth Circuit further stated:

> Wyoming is free to construe its own rules and statutes differently than the United States interprets its identical rules. However, the Wyoming court has not done so.... In the absence of guidance from the Wyoming courts, however, we must adhere to the statutory construction given by the United States Supreme Court.
>
> *Mason*, 719 F.2d at 1489.

**4.** In *State v. Habbena*, 372 N.W.2d 450 (S.D. 1985), the Supreme Court of South Dakota found that reasonable cause existed to execute a search warrant at night even though the warrant did not facially comply with the requirements of the rules of criminal procedure concerning service at that time. The court reasoned that the transient nature of the evidence which was sought, "buy money" which had been used in a cocaine sale, justified the nighttime service. The court so held even though four officers had already entered the premises to secure it pending arrival of the warrant. In *Boyd v. Arkansas*, 13 Ark.App. 132, 680 S.W.2d 911 (1984), the reasoning was similar. Because marked bills which had been used to purchase marijuana could be removed from the residence which was the subject of the search, the nighttime execution of a warrant was justified despite the apparent inadequacy of the search warrant.

court commissioner issuing the warrant," not by a reviewing court. *See United States v. Tedford,* 875 F.2d 446, 450 (5th Cir.1989) and cases cited therein (later determination that cause existed does not remedy Fed.R.Crim.P. 41(c) violation for execution at night). The Court finds that neither the affidavit nor warrant provided the reasonable cause required in Wyoming for a search warrant to be served at night.

■ While the defendant would have the Court's analysis end here, and all evidence be suppressed, the Court finds no support in the law for such a result. The defendant's conclusory contention that "the documents in question simply cannot withstand constitutional muster," assumes that noncompliance with the Wyoming statute and W.R.Crim.P. 40(c) automatically rises to a constitutional violation requiring the exclusion of the evidence. This assumption, that the Wyoming statute and rule and the fourth amendment are coextensive, is not supported by cogent argument. As the eighth circuit noted in *United States v. Schoenheit,* 856 F.2d 74 (8th Cir.1988), discussing Fed.R.Crim.P. 41(c):

> Rule 41 and the Fourth Amendment are not coextensive * * *. While the time of the search is a relevant consideration in determining whether a search is reasonable under the Constitution, the court is aware of no authority for concluding that a search is *per se* unconstitutional simply because it was conducted after 10:00 p.m.

*Id.* at 77, quoting *United States v. Schoenheit,* No. 86–06010–01–CR–W–6, slip op. at 2 (W.D.Mo. July 23, 1987).

Although the defendant is quite correct in noting that the scope of Wyo.Stat. § 35–7–1045 has been addressed by the Wyoming Supreme Court, the decision in *Ehrenborg* does not speak to the question which the Court must answer here. The Court has been unable to find any Wyoming case which discusses the proper standard to apply for exclusion when there has been a violation of the additional cause requirement for a nighttime search. As the *Mason* court noted, the Wyoming Supreme Court has held that "when local

statutes derive from federal laws, 'precedent emanating from the federal courts on such matters must be given great weight.' " *Mason,* 719 F.2d at 1489, quoting *Dobbins v. State,* 483 P.2d 255, 258 (Wyo.1971). *See also Zanetti v. State,* 783 P.2d 134 (Wyo.1989).

The federal cases on this subject originate from failures to comply with Fed.R. Crim.P. 41(c),[5] which requires the service of warrants in the daytime, unless the issuing authority finds reasonable cause for its execution at times other than daytime. In *United States v. Searp,* 586 F.2d 1117 (6th Cir.1978), the circuit court considered the effect of a violation of the federal rule governing the standards and procedures regarding procuring warrants and conducting searches. The application for warrant in that case provided no justification for searching at night, and the court held that the subsequent nighttime search violated Rule 41(c). The court reasoned, however, that:

> it [is] important to differentiate between the *right* to be free from unnecessary and frightening intrusions by the State into our homes in the middle of the night and the *procedures* which have been established to protect that right. In this case the defendant's interests have not been violated, though the procedures were not observed.

*Searp,* 586 F.2d at 1122 (emphasis in original).

Because the procedures may be violated in instances when the individual's rights have not been, the court concluded that the exclusionary rule is not an appropriate remedy in all circumstances where procedural rules governing search warrants have been violated. The *Searp* court applied the "prejudicial error" test espoused by the second circuit court in *United States v. Burke,* 517 F.2d 377 (2d Cir.1975). That court held that:

> [V]iolations of Rule 41 alone should not lead to exclusion unless (1) there was "prejudice" in the sense that the search

---

5. Cases have not arisen in this vein for noncompliance with the requirements of 21 U.S.C. § 879(a), because after *Gooding,* an additional showing of cause for nighttime searches in federal narcotics cases is not required.

might not have occurred or would not have been so abrasive if the Rule had been followed, or (2) there is evidence of intentional and deliberate disregard of a provision in the Rule.

*Id.* at 386–87. That rule was also applied in *Schoenheit,* 856 F.2d at 77, where a search warrant was issued authorizing nighttime service. In that case, the application and affidavits were devoid of any showing of cause to search at night. A DEA agent who testified at the suppression hearing stated that he knew of no reason why the search should be conducted at night.

The eighth circuit held, however, that suppression is not the automatic result when there has been noncompliance with Rule 41. Applying the prejudicial error rule, the court found nothing in the record demonstrating that the search would not have been conducted, or could have been any less abrasive, and affirmed the district court's admission of evidence seized in the search.

The approach in the above cases has been employed by other courts facing the same issue.[6] *See, e.g., United States v. $22,287,* 709 F.2d 442, 447–49 (6th Cir.1983) (nighttime execution does not per se invalidate a search); *United States v. Pryor,* 652 F.Supp. 1353 (D.Me.1987); *Rodriguez v. Superior Court,* 199 Cal.App.3d 1453, 245 Cal.Rptr. 617 (1988) (evidence seized in violation of state rule should not be excluded if search is otherwise reasonable under the fourth amendment); *State v. Fixel,* 744 P.2d 1366 (Utah 1987) (applying prejudicial error test where police officer did not comply with statutory requirements); *Commonwealth v. Johnson,* 315 Pa.Super. 579, 462 A.2d 743 (1983) (warrant providing insufficient basis for nighttime search upheld citing *Searp); State v. Brock,* 53 Or.App. 785, 633 P.2d 805 (1981) (applying *Searp* reasoning to validate nighttime search).

The Court finds that although the execution the warrant at night was in violation of the Wyoming rules, in light of the above analysis, the circumstances of this particular search do not justify suppression. First, the Court was given no evidence that the defendants were prejudiced by the nighttime service. There has been no showing that the searches which were conducted at 313 Siskin and the Riverside Mini Storage shed would not have occurred absent the prompt nighttime execution of the warrants. In fact, all indications are that the two locations would have remained secured by the task force agents until the warrants could be executed. No evidence was presented suggesting that the searches were abrasive in character because of the time at which they were executed. No one was in the residence at that time.

Second, there has been no allegation of either intentional or deliberate disregard by the agents for the requirements of the Wyoming statute or rule. Actually, the evidence suggested just the opposite, that the agent preparing the affidavit may or may not have even been aware that nighttime execution of warrants always requires an additional showing of cause.

This Court is not compelled to apply the exclusionary rule to statutory, and not constitutional, violations.

## CONCLUSION

The Court finds initially that the seizure from Rexius' person of a set of keys was pursuant to a lawful arrest. Consequently, the seizure was justified because the keys constituted mere evidence that the officers may have believed would aid in the conviction of the defendant. Were this not so, the Court finds that the evidence would have been discovered in the course of the lawful investigation already underway.

Second, the Court finds no privacy interest attached to the identification of the particular storage shed as the defendant's,

---

6. The reasoning has also been applied in situations where the violation has been of another procedural requirement for obtaining or executing a warrant. *See, e.g., United States v. Marx,* 635 F.2d 436 (5th Cir.1981) (Rule 41(d) violation); *United States v. Vasser,* 648 F.2d 507 (9th Cir.1980) (Rule 41(c)(1) violation); *United States v. Burgard,* 551 F.2d 190 (8th Cir.1977) (Rule 41(a) violation); *United States v. Dauphinee,* 538 F.2d 1 (1st Cir.1976) (Rule 41(d) violation).

and thus the insertion of a key into the lock on the shed for identification purposes only did not violate the fourth amendment.

Further, the affidavits presented to Judge Leimback provided sufficient information with which to make a determination that probable cause existed to search the residence and storage shed. While this Court may have required for more information, in a marginal case such as this, deference to the magistrate's determination is mandated by the law.

Finally, the service of a search warrant at night violates Wyoming law if an additional showing is not made in the application or affidavits that additional cause exists for its service at such time. In the present case, the service of the search warrants was not in accordance with the law. The violation of that rule will not, however, always compel a reviewing Court to apply the exclusionary rule. If there is no showing that the defendant was prejudiced by the nighttime service, because the search would not have occurred or would have been less abrasive if conducted in the daytime, nor a showing that the officers intentionally or deliberately disregarded the safeguards provided by the Wyoming law, suppression may not be the appropriate remedy. The Court finds that it is not.

IN ACCORDANCE WITH THE ABOVE FINDINGS the defendant's Motion to Suppress is DENIED.